# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs October 29, 2014

## WILLIAM L. GREEN v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 2007-B-1404   Cheryl Blackburn, Judge**

---

### No. M2013-02840-CCA-R3-PC - Filed October 31, 2014

---

The Petitioner, William L. Green, appeals the Davidson County Criminal Court's denial of his petition for post-conviction relief from his 2010 conviction for second degree murder and his twenty-three-year sentence. The Petitioner contends that he received the ineffective assistance of counsel and that the post-conviction court erred by denying him relief. We affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROGER A. PAGE, JJ., joined.

Elaine Heard, Nashville, Tennessee, for the appellant, William L. Green.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Glenn Funk, District Attorney General; and Bret Gunn, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case arises from the Petitioner's killing Marvin Allen Ivory on March 2, 2007. The Petitioner appealed his conviction, and this court affirmed the conviction and summarized the facts of the case as follows:

> The defendant's conviction in this case relates to the shooting death of the victim, Marvin Allen Ivory, on March 2, 2007. At trial, the victim's sister, Bobbie Ivory, testified that on March 2, 2007, she had gone to a neighborhood store with two cousins when she saw the defendant, whom she knew as "Little Green," exit a green Thunderbird while talking on a cellular telephone. Ms.

Ivory said that the defendant told the person to whom he was speaking that "he needed a gun because this n***** had just got [his] money."

Ms. Ivory and her companions left the market while the defendant was still in the store, and they returned to Ms. Ivory's mother's residence. At approximately 9:30 p.m., the victim and Tyrez Jones pulled into the driveway in a silver truck and then immediately "pulled back off." Approximately half an hour later, Ms. Ivory was prompted to look out the window by barking dogs. She saw the victim's apparently driver-less silver truck roll backward into a house. Ms. Ivory and her mother went to investigate and discovered that the victim was unconscious inside the locked truck. The women went to telephone police, and when they finally succeeded in rousing the victim, he told them that he had been shot in the back by "Little Green and Big Yo" because he "found $50.00 and [the defendant] said it was his." Ms. Ivory said that the victim was bleeding profusely from a gunshot wound to the "back part of his body."

Ms. Ivory said that emergency medical personnel "took so long" to arrive that she, her mother, and her cousins drove the victim to Nashville General Hospital at Meharry. From there, the victim was transferred to Vanderbilt Medical Center, where he died the following morning. The victim's mother, Virginia Ivory, confirmed her daughter's testimony, noting that the victim told them that "Little Green and Big Yo" had shot him. The victim's cousin, April Ivory, confirmed that she and Bobbie Ivory saw the defendant and an individual she knew as "Big Yo" at the neighborhood market but said that she could not overhear the defendant's telephone conversation.

Another of the victim's cousins, Iris Murphy, testified that she was inside the neighborhood market when the defendant, whom she knew as "Little Green," entered the market talking on a cellular telephone. She said that the defendant "was saying he was upset because [the victim] supposed to of took his money and he was mad because he did not have his strap in." She stated that the defendant said he was going to shoot the victim the next time he saw the victim. Ms. Murphy said that after the defendant ended his telephone conversation, he turned to her and told her that he intended to shoot the victim because the victim had taken $50.00 "off the floor" that belonged to the defendant. Ms. Murphy said that she did not take the defendant's threats seriously, but she did telephone the victim and tell him what the defendant had said. She recalled that the victim did not take the threats seriously either. Later on that evening, she learned that the victim had been shot, and she went

to her aunt's house immediately. There she heard the victim say that he had been shot by "Little Green and Big Yo."

Tyrez Johnson, the victim's companion on March 2, 2007, testified that he and the victim were "supposed to be going chilling at the hotel with some females," but the victim insisted on making a side trip to speak to "that bitch ass n***** little Green." Mr. Johnson said that the victim told him that he had found $50.00 earlier in the day and that the defendant had claimed the money belonged to him. The victim drove to the defendant's mother's house and "pulled up kind of aggressive like, like something was fixin [sic] to happen." At that point, the victim and the defendant argued, with the victim being somewhat more aggressive than the defendant. Mr. Johnson said that he did not see a gun in the victim's possession but did see the defendant walk back to his car and arm himself with a handgun. At that point, the victim asked the defendant if he was "pistol playing" him, which Mr. Johnson explained to mean "showing the pistol period." The defendant then shot the victim. Despite his wound, the victim was able to get back into his truck and drive away. Mr. Johnson ran away from the scene and returned to his house, where he went to sleep.

Cousins Temeka Crawford, Malika Riley, and Narkeetha Dillard went to the defendant's mother's house on March 2, 2007, to visit the defendant's nephew, Josh Green. Ms. Crawford recalled that while she was at the house, the defendant arrived and told the gathered teenagers that someone had stolen $50.00 from him and that he was "going to pop" the perpetrator. A short time later, the victim pulled up, the two men argued, and the defendant went to his car and armed himself with a handgun. Ms. Crawford heard the victim say, "[A]re you going to shoot me? I ain't scared of no gun." The defendant then shot the victim, and the victim got back into his truck and drove away. Ms. Dillard confirmed Ms. Crawford's version of events, and added that prior to the victim's arrival, the defendant displayed the firearm and said, "[H]e better not play with me I just bought this strap."

Doctor Amy R. McMaster, the medical examiner practicing for the same private company as the doctor who performed the autopsy of the victim, testified that the victim died from a single gunshot wound to his torso that "entered on the left lower abdomen and exited on the right hip." The bullet injured the blood vessels in the mesentery, which "is the supporting structure of the bowel," and the iliac vessels of the pelvic area. She said "unless [the

victim] was shot while standing in a[n] emergency room that had the capability of repairing these wounds, these wounds are fatal wounds."

During cross-examination, Doctor McMaster testified that tests on the victim's blood "revealed the presence of ethanol which is alcohol, drinking alcohol. It revealed THC which is an active ingredient in marijuana. It also revealed cocaine and cocaine metabolites, cocaine metabolites is what your body turns cocaine into in the process of clearing it from the body."

Metropolitan Nashville Police Department Detective Danny Satterfield led the investigation into the victim's murder. He testified that "[t]here was no physical evidence that was located" at the scene of the shooting. After interviewing witnesses, he obtained a warrant for the defendant's arrest. The defendant reported to the police station later that same day and provided a videotaped statement to police. Detective Satterfield said that the defendant initially denied being present at the scene but later admitted shooting the victim and claimed he did so in self-defense. The defendant's videotaped statement was played for the jury.

At the conclusion of Detective Satterfield's testimony, the State rested.

The defendant's nephew, Joshua Green, testified on behalf of the defendant, that on March 2, 2007, the defendant told him that the victim had threatened the defendant. A short time later, the victim "pulled up aggressively" in his truck. The two men argued, and Mr. Green claimed that the victim called someone on his cellular telephone during the argument and asked the person to "bring that burner thing." Mr. Green "guess[ed]" that "burner thing" was a firearm. He said that the victim was unarmed and standing in the street "swing[ing] his hands" when the defendant aimed the gun and shot the victim.

The defendant testified that he had known the victim for "5 or 6 years" and during that time had known the victim to carry a weapon and be "a hot-headed type person." He said that after the dispute over the $50.00, the victim told him that he would "catch [him] in traffic," which the defendant interpreted to mean that the victim intended to kill him "or something." The defendant denied threatening the victim and specifically denied telling Ms. Murphy that he intended to arm himself and shoot the victim. He claimed that he merely told Ms. Murphy to tell the victim that he wanted his money back.

-4-

The defendant testified that late on the evening of March, 2, 2007, he was in front of his mother's residence talking to his nephew and some girls when the victim "pulled up on [him]." He said the victim immediately opened the truck door and they "had words [and] got to arguing back and forth" about the $50.00. According to the defendant, he asked the victim if he wanted to fight, and the victim responded that he did not but that they "can go to guns or something." The defendant claimed that after the victim mentioned guns, "he reached up under his seat as he was getting out," prompting the defendant to return to his own car and get a gun. The defendant said that he aimed the gun "low at the ground" and "shot [the victim] in his leg." He claimed that he purposely aimed low so as to scare the victim. He stated that he "really was not trying to shoot" but believed that the victim was reaching for a weapon. He admitted, however, that he never saw the victim in possession of a weapon.

The defendant testified that after being shot, the victim "got back in the car and left." He said that after the shooting, he went over to his "play auntie's house." He said that an individual he knew by the moniker "JoJo" had placed the weapon in his car and came to his "play auntie's house" to retrieve the weapon after the shooting. The defendant claimed that he did not know "JoJo's" first or last name.

Despite Ms. Murphy's testimony to the contrary, the defendant denied asking her to communicate a threat to the victim. In addition, despite Ms. Dillard's testimony to the contrary, the defendant maintained that he did not display a weapon prior to the victim's arrival at his mother's house.

During cross-examination, the defendant denied that "JoJo" had brought the gun to him for the purpose of confronting the victim and attributed [its] presence in his vehicle at the precise moment the victim arrived to happenstance. The defendant denied knowing the make and model of the weapon or even whether it was loaded when he retrieved it from the car. He said that he picked up his son and his "baby's mamma" from his "play auntie's house" and took them to his brother's house, where they all went to sleep for the night.

On this proof, the jury convicted the defendant of the lesser included offense of second degree murder. The trial court imposed a sentence of 23 years' incarceration[.]

*State v. William Lamont Green*, No. M2010-01631-CCA-R3-CD, slip op. at 1-5 (Tenn. Crim. App. July 20, 2011), *perm. app. denied* (Tenn. Nov. 15, 2011).

The Petitioner filed a pro se petition for post-conviction relief alleging multiple grounds of ineffective assistance of counsel and various due process and equal protection violations. After the appointment of counsel, an amended petition was filed also alleging that trial counsel was ineffective by failing to consult with him at critical stages of the criminal process and that he did not understand fully the nature and consequences of his decision to testify.

At the post-conviction hearing, the Petitioner testified that he did not "feel comfortable" with trial counsel's representation. He said that counsel represented him for about one year and that he saw counsel once or twice during that time. Their meetings occurred at the courthouse during scheduled appearances, and the Petitioner denied counsel came to the jail. The Petitioner denied counsel reviewed the State's discovery package, but he acknowledged receiving the discovery from a previous attorney. He denied counsel ever discussed the State's evidence and the witnesses's potential trial testimony, although the Petitioner "had an idea" of what the State's witnesses would say at the trial.

The Petitioner testified that he wanted trial counsel to interview Mr. Ali, who worked at or owned the store, but that counsel did not interview him. He said that to his knowledge, counsel did not hire an investigator. The Petitioner said Tyrez Johnson testified for the State and was inside the victim's truck. The Petitioner wanted counsel to cross-examine Mr. Johnson, but counsel did not question him. When asked why counsel did not question Mr. Johnson, the Petitioner said, "I guess [counsel] felt like he did a good job. That's what he . . . told me."

The Petitioner testified that trial counsel failed to cross-examine witnesses about their prior inconsistent statements. He said that Narkeetha Dillard told the detectives that before the victim left the truck, he reached under the seat but that counsel did not cross-examine her about what she saw. The Petitioner asked counsel to file a motion to suppress his police statement, but counsel did not file the motion. He said counsel initially said he would file the motion, but counsel did not discuss his reason for ultimately not filing it.

The Petitioner testified that he did not understand why the trial court classified him as a Range III offender and denied that trial counsel said the Petitioner could present witnesses at the sentencing hearing. He denied counsel explained enhancement and mitigating factors. He said counsel failed to inform him that the State could request the court to increase the Petitioner's sentence.

On cross-examination, the Petitioner testified that he had two attorneys before trial counsel, that he received the discovery package from one of the previous attorneys, and that the previous attorney did not review the materials with him. He agreed, though, that he read the materials. He thought it was possible that one of his attorneys filed a motion to suppress his video-recorded statement to the police and that the trial judge watched the video when the Petitioner was not in the courtroom to determine whether it should have been suppressed.

The Petitioner testified that trial counsel reviewed the case with him on the day of the trial and that counsel did not provide him enough time to understand what was happening. He denied knowing counsel subpoenaed the victim's medical records and said counsel never mentioned the State's offer to settle the case. He said that on the day of the trial, counsel asked if the Petitioner was going to testify and that the Petitioner replied, "Yeah." The Petitioner said, "[Counsel] just asked me was I getting on the stand. He didn't ask me whether or not I wanted to[.]" He thought counsel was telling him that he had to testify. He denied that he and counsel discussed the benefits and pitfalls of testifying. The Petitioner testified at the trial, and he told the jury he left the scene and went home after the "altercation." He said the victim "was riding around looking" for him, "pulled up on [him]," and threatened him. The Petitioner said the witnesses who testified for the State were the victim's relatives and "in [the victim's] favor."

Upon questioning by the post-conviction court, the Petitioner agreed that his nephew testified for the defense. He agreed that his nephew testified that the victim pulled up in his truck aggressively, that the victim and the Petitioner argued, and that the victim called someone asking the caller to "bring that burner thing." He agreed the victim was unarmed standing in the street when the Petitioner shot him. He denied trial counsel explained that he had to testify in order for a self-defense jury instruction to be warranted. He did not recall the trial judge telling the jurors during jury selection that the Petitioner was not required to testify and that the jurors could not consider the Petitioner's decision not to testify in determining a verdict. He did not recall the judge's telling the jurors that the burden to prove the Petitioner's guilt was on the State.

The post-conviction court showed the Petitioner a motion to suppress the Petitioner's police statement that trial counsel filed on January 12, 2009, and the Petitioner denied ever receiving it. The court said a suppression hearing was held on February 4, 2009, and the Petitioner said he was not present for the hearing. The court said the prosecutor presented the recorded statement for the trial court's review without presenting witnesses. The court noted a written order was issued before the trial.

The Petitioner testified that although he told the jury his version of events, he did not "go into detail outside of [trial counsel's] questions." He agreed he told the jury that the victim reached under the truck seat, that the Petitioner felt as though he needed to get his gun, that the Petitioner aimed low at the ground, that the Petitioner did not aim to kill the victim, and that the Petitioner only wanted to scare him. He agreed this version of events was accurate.

Trial counsel testified that he had been licensed to practice law since 1975 and had practiced mostly criminal law. Counsel's representation began at the arraignment, and he agreed two previous attorneys withdrew because of conflicts of interest. He obtained funds for an investigator, Patrick Wells, and told the Petitioner to talk to Mr. Wells. He told the Petitioner that Mr. Wells was easier to contact and could come to the jail more frequently than counsel. He said Mr. Wells reviewed the discovery package with the Petitioner at the jail.

Trial counsel testified that he filed a motion to suppress the Petitioner's pretrial statement. He recalled the Petitioner said during the majority of the police interview that he was not present during the shooting. The police officer told the Petitioner that the interview was going to "start over," and that if the Petitioner was truthful, the officer would "forget" the denials. Counsel sought to prevent the jury from hearing the Petitioner's initial denial. He recalled that at the suppression hearing, the prosecutor presented the recording of the interview to the trial court for review without witness testimony.

Trial counsel testified that he understood the victim was not taken to a hospital immediately following the shooting but returned to a relative's house. Counsel was concerned that the unnecessary delay in medical treatment was an independent intervening "variable." Counsel subpoenaed the victim's medical records, and he reviewed them. He said the physicians told him that in all likelihood the victim would have died regardless of the delay in obtaining medical treatment because of the way the bullet entered the victim's body.

Trial counsel testified that the State offered to settle the case if the Petitioner pleaded guilty to second degree murder, although he could not recall if the offer was for twenty-five or thirty years at 100% service. Counsel conveyed the offer to the Petitioner, who believed he acted in self-defense because the victim came after the Petitioner. Counsel believed "supporting evidence" bolstered the Petitioner's self-defense claim. The Petitioner rejected the offer.

Trial counsel testified that he and the Petitioner discussed the benefits and pitfalls of testifying. He told the Petitioner that self-defense was an affirmative defense related to the Petitioner's state of mind and that the only way to present evidence of the Petitioner's state of mind was for the Petitioner to testify. He told the Petitioner that claiming self-defense required the Petitioner to tell the jury that he thought he was in imminent danger.

Trial counsel testified that multiple witnesses gave statements to the police, that the statements were recorded, and that Mr. Wells reviewed those recordings with the Petitioner at the jail. He recalled Mr. Johnson, the passenger in the victim's truck, testified at the trial that he begged the victim to leave before the shooting. Mr. Johnson testified that the victim was angry, was cursing, and was threatening the Petitioner, and counsel thought the testimony was beneficial to the Petitioner's self-defense claim. Counsel said that in light of the Petitioner's statement, the only possible theory was self-defense. Counsel agreed the Petitioner initially denied but ultimately admitted being at the scene. Counsel recalled that the incident between the victim and the Petitioner "cascad[ed] through the evening and . . . came to a head when" the victim came to the Petitioner's location, which was in front of the Petitioner's house, and challenged the Petitioner. He discussed those facts with the Petitioner, and they agreed this evidence was the only way to justify the shooting as self-defense.

Trial counsel testified that he told the Petitioner that a self-defense theory "necessitate[d] the defendant taking the stand and explaining . . . what he thought was happening that justified . . . taking that life." He said it was clear that the Petitioner had to testify in order to argue self-defense to the jury. He and the Petitioner discussed the possible questions he faced on cross-examination. He told the Petitioner that the prosecutor would ask questions about the witness who said the Petitioner retrieved his gun from his car. The Petitioner claimed the gun was in his belt and said the witness was wrong. Counsel said he always cautioned his clients that one of the pitfalls of testifying was the skill of the prosecutor and that a "cavalier statement" could be used against them.

Trial counsel testified that he did not recall the Petitioner's ever identifying potential witnesses, although he told his clients to tell Mr. Wells about anyone who might help the defense. He said Mr. Wells provided reports of his interviews and usually provided recordings unless someone objected to being recorded. Counsel reviewed the reports and any recordings before the Petitioner's trial. He also reviewed the detailed police reports.

On cross-examination, trial counsel testified that although he did not recall how long he represented the Petitioner, similar cases lasted about one to two years. He did not recall the number of times he met with the Petitioner at the jail but said his usual practice was to send Mr. Wells to the jail until close to trial. He said he began meeting with clients close to

trial, which included meeting at the courthouse. Although counsel recalled Mr. Ali was a trial witness, he could not recall if Mr. Wells interviewed him. He said that Mr. Ali was not at the scene at the time of the shooting and that he might not have "keyed" on Mr. Ali. He thought Mr. Wells was unable to interview Mr. Johnson before the trial because Mr. Johnson, like the victim's family, did not want to talk to Mr. Wells. He thought Mr. Wells spoke to Ms. Dillard before the trial but was unsure. Counsel said he had Ms. Dillard's statement.

Trial counsel testified that he and the Petitioner discussed whether the Petitioner should testify at the trial. He told the Petitioner that if he wanted to argue self-defense, the Petitioner needed to testify. He did not have any reservations about the Petitioner's testifying and said the Petitioner was eager because he believed he acted in self-defense. Counsel told the Petitioner that he would permit the Petitioner to tell his story on direct examination and that the State would ask him questions on cross-examination. He told the Petitioner that the State would ask questions relative to the witness who stated the Petitioner retrieved his gun from his car. Counsel told the Petitioner to be prepared to address the issue, although counsel did not suggest the answers. Counsel could not tell the Petitioner every question the State might ask, but he provided the Petitioner with potential areas for questioning.

Trial counsel testified that the Petitioner did not express any reservations about his not cross-examining Mr. Johnson. Counsel said that in a break during the trial, he and the Petitioner discussed whether to question Mr. Johnson. Counsel thought Mr. Johnson said everything helpful to the defense during direct examination and did not want to provide Mr. Johnson an opportunity to "back up" on his testimony.

Trial counsel testified that his discussion with the Petitioner about the State's plea offer was short because the Petitioner was not interested in serving 100% of any sentence or in pleading guilty to any type of homicide. He said their discussion probably occurred when the case was scheduled for trial. He did not recall discussing a plea offer close to trial. Counsel said the Petitioner wanted a trial.

In a written order, the post-conviction court denied relief. Regarding the Petitioner's claim that trial counsel failed to consult with him and failed to render advice sufficient to allow the Petitioner to make an informed decision about whether to testify, the court credited counsel's testimony. The court found that counsel and the Petitioner discussed the benefits and pitfalls of proceeding to trial and the need for the Petitioner to testify if the chosen defense was self-defense. The court found that counsel's investigator, Patrick Wells, reviewed the discovery materials with the Petitioner. The court found that although counsel might not have visited the Petitioner at the jail, counsel met with the Petitioner at court appearances. The court found that the Petitioner conceded that he reviewed the discovery

materials before the trial. The court noted that the record showed the trial court reviewed with the Petitioner his right to testify during a jury-out hearing at the trial.

Regarding the Petitioner's claim that trial counsel failed to cross-examine Mr. Johnson, the post-conviction court found that counsel and the Petitioner discussed Mr. Johnson's beneficial testimony on direct examination regarding the self-defense theory and that counsel made a strategic decision not to cross-examine Mr. Johnson. Counsel feared that given the opportunity, Mr. Johnson might "back pedal" from his testimony if counsel questioned him. Counsel feared unfavorable testimony if the prosecutor were permitted to question Mr. Johnson further.

Regarding the Petitioner's claim that trial counsel failed to call Mr. Ali as a trial witness, the post-conviction court found that counsel obtained an investigator to interview the witnesses but that some of the State's witnesses refused to speak with the investigator. The court found that counsel had the detailed police statements from the State's witnesses and knew the substance of any potential testimony. Relative to Mr. Ali, the court noted that the Petitioner did not present Mr. Ali at the evidentiary hearing and refused to speculate about what Mr. Ali's testimony might have been.

Regarding the Petitioner's claim that trial counsel failed to file a motion to suppress his statement to the police, the post-conviction court found that counsel filed a motion to suppress the statement on January 12, 2009, and that a hearing was held on February 4. The court found that at the hearing, no witnesses testified but that the recorded statement was presented to the trial court. The trial court reviewed the recording and denied the motion to suppress. The post-conviction court noted that the Petitioner's trial testimony was consistent with his statement to the police.

Regarding the Petitioner's claim that he was sentenced pursuant to an improper offender classification, the post-conviction court found that sentencing issues were not cognizable post-conviction claims. The court noted, though, that the Petitioner's criminal history was more extensive than reflected in his testimony at the post-conviction hearing. The court noted the Petitioner was on probation at the time of the killing and that his previous history, which included drug- and weapons-related offenses, was presented at the bond hearing before the trial. This appeal followed.

The Petitioner contends that he received ineffective assistance because trial counsel failed to meet with him adequately, failed to explain adequately the State's discovery materials, failed to interview and present Mr. Ali as a trial witness, failed to cross-examine Mr. Johnson, failed to cross-examine Ms. Dillard about a previous statement in which she claimed the victim reached under the seat of his car before the shooting, and failed to explain

the sentencing process. The State responds that the post-conviction court properly denied relief. We agree with the State.

Post-conviction relief is available "when the conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103 (2012). A petitioner has the burden of proving his factual allegations by clear and convincing evidence. *Id.* at § 40-30-110(f) (2012). A post-conviction court's findings of fact are binding on appeal, and this court must defer to them "unless the evidence in the record preponderates against those findings." *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *see Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's application of law to its factual findings is subject to a de novo standard of review without a presumption of correctness. *Fields*, 40 S.W.3d at 457-58.

To establish a post-conviction claim of the ineffective assistance of counsel in violation of the Sixth Amendment, a petitioner has the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). The Tennessee Supreme Court has applied the *Strickland* standard to an accused's right to counsel under article I, section 9 of the Tennessee Constitution. *See State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner must satisfy both prongs of the *Strickland* test in order to prevail in an ineffective assistance of counsel claim. *Henley*, 960 S.W.2d at 580. "[F]ailure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). To establish the performance prong, a petitioner must show that "the advice given, or the services rendered . . . , are [not] within the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975); *see Strickland*, 466 U.S. at 690. The post-conviction court must determine if these acts or omissions, viewed in light of all of the circumstances, fell "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. A petitioner "is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision." *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); *see Pylant v. State*, 263 S.W.3d 854, 874 (Tenn. 2008). This deference, however, only applies "if the choices are informed . . . based upon adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). To establish the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*,

466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

Regarding trial counsel's failure to meet adequately with the Petitioner and failure to explain the State's discovery materials, the record reflects that counsel's performance was not deficient and that there was no prejudice to the outcome of the proceedings. Counsel's credited testimony shows that he obtained funds to hire Mr. Wells as an investigator. Counsel told the Petitioner to speak with Mr. Wells because Mr. Wells was easier to contact and could come to the jail more frequently than counsel. The Petitioner admitted to receiving the discovery materials from a previous attorney, and counsel said Mr. Wells reviewed those materials with the Petitioner. The Petitioner also admitted he reviewed the materials before the trial. Counsel's usual practice was to have a client meet with Mr. Wells during the investigatory stage of a case and for counsel to meet with a client close to trial. Although counsel might not have met with the Petitioner at the jail, it was undisputed that they met at court appearances.

Regarding trial counsel's failure to interview and present Mr. Ali as a trial witness, failure to cross-examine Mr. Johnson, and failure to cross-examine Ms. Dillard about her previous statement, the record reflects that counsel's performance was not deficient and that there was no prejudice to the outcome of the proceedings. Relative to Mr. Ali, the record reflects that counsel could not recall if Mr. Wells interviewed him before the trial but said Mr. Ali was not at the scene at the time of the shooting. In any event, the Petitioner did not present Mr. Ali as a witness at the post-conviction hearing, and this court will not speculate about any potential testimony. When a petitioner claims counsel was ineffective by failing to call a witness at a trial, a petitioner generally cannot establish prejudice without presenting that witness at the post-conviction hearing. *Black v. State*, 794 S.W.2d 752, 757-58 (Tenn. Crim. App. 1990) (concluding that a post-conviction petitioner should produce a material witness "who (a) could have been found by a reasonable investigation and (b) would have testified favorably in support of his defense if called" to establish his claim).

Relative to the cross-examination of Mr. Johnson, trial counsel and the Petitioner discussed during a trial break whether counsel should cross-examine Mr. Johnson. Counsel concluded that Mr. Johnson's testimony on direct examination supported the self-defense theory. Further, counsel testified that the Petitioner did not express any reservation about counsel's not cross-examining Mr. Johnson. Counsel made an informed, strategic decision not to cross-examine Mr. Johnson because he feared Mr. Johnson would back away from his favorable testimony and provide unfavorable testimony if the prosecutor were permitted to question him further. The appellate courts "will not second-guess trial counsel's informed tactical strategic decisions." *Pylant*, 263 S.W.3d at 874; *see Adkins*, 911 S.W.2d at 347.

Relative to Ms. Dillard's alleged previous statement that she saw the victim reach under the seat of his car before the shooting, the record reflects that she testified at the trial that the Petitioner retrieved his gun from his car just before the shooting. At the post-conviction hearing, trial counsel testified that he recalled Ms. Dillard was present during the shooting and that he had her statement before the trial. The Petitioner argues in his brief that counsel did not refute the Petitioner's claim that Ms. Dillard should have been asked about the prior inconsistent statement. However, post-conviction counsel never asked trial counsel about Ms. Dillard's making a previous statement in which she said the victim reached under the seat of his car before the shooting. The Petitioner had the burden of proving the allegation by clear and convincing evidence. *See* T.C.A. § 40-30-110(f). The record before this court does not contain evidence of such a previous statement, and no evidence was presented at the hearing regarding any potential deficiency. In any event, Ms. Crawford and Mr. Johnson testified similarly to Ms. Dillard regarding the Petitioner's obtaining his gun from his car, not from his belt as the Petitioner claimed.

Regarding trial counsel's failure to explain the sentencing process, the Petitioner argues that counsel failed to explain that the Petitioner could present witnesses at the sentencing hearing and that the trial court would determine his within-range sentence based on the presence of enhancing and mitigating factors. Although the Petitioner claims counsel did not "refute this allegation," the record reflects that post-conviction counsel failed to ask trial counsel about the sentencing hearing and what relevant information counsel and the Petitioner discussed. The Petitioner had the burden of proving his allegation by clear and convincing evidence. *See* T.C.A. § 40-30-110(f). A mere allegation of deficient performance will not suffice. The Petitioner failed to present any witness whom he would have presented at the sentencing hearing. The Petitioner is not entitled to relief.

In consideration of the foregoing and the record as a whole, the judgment of the post-conviction court is affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE

-14-